UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

LIFE PRODUCT CLEARING LLC,                      :

                          Plaintiff,            :

              - against -                       :

LINDA ANGEL, Personal                           :
Representative of the Estate
of Leon Lobel,                                  :

                          Defendant.            :

- - - - - - - - - - - - - - - - - -x            **OPINION**

LINDA ANGEL, Personal                           :     07 Civ. 475 (DC)
Representative of the Estate
of Leon Lobel,                                  :

                     Third-Party                :
                     Plaintiff,
                                                :
              - against -
                                                :
LEON LOBEL INSURANCE TRUST and
JONATHAN S. BERCK, as Trustee of                :
the Leon Lobel Insurance Trust,
                                                :
                     Third-Party
                     Defendants.                :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/22/08

**APPEARANCES:**   (See last page)

**CHIN, D.J.**

        On November 15, 2005, Leon Lobel -- a retired butcher

who was then seventy-seven years old -- established the Leon

Lobel Insurance Trust (the "Trust"), naming himself as the

"Initial Beneficiary."  The same day, he applied for a $10

million life insurance policy (the "Policy"), designating the

Trust as the sole beneficiary.  The premium for the Policy for

the first year alone was $572,000, an amount Lobel could not

afford. The Policy was issued on December 14, 2005. Six days later, Lobel sold his interest in the Trust -- and thus the right to any insurance proceeds upon his death -- to plaintiff Life Product Clearing LLC ("LPC") for $300,000. Lobel received payment of that amount on January 5, 2006. Five days later, he died. After a year-long investigation, the insurance company paid the face value of the Policy plus interest -- $10,712,328.77 -- to the Trust.

In this case, LPC sues Lobel's daughter, Linda Angel, the personal representative of Lobel's estate, for a declaration that LPC is the rightful beneficiary of the Trust. Angel asserts counterclaims against LPC and third-party claims against the Trust and its Trustee, Jonathan S. Berck, contending that Lobel's transfer of his interest in the Trust to LPC was void as against public policy. In essence, Angel argues that the transaction involved an impermissible "wager policy" -- she maintains that LPC, a stranger to her father, gambled on his life, wagering $300,000 that he would die sooner rather than later. In fact, the "wager" turned out to be extraordinarily successful because Lobel died within days, and LPC stands to earn more than $10.7 million from its $300,000 investment.

Before the Court is a motion for judgment on the pleadings filed by LPC, the Trust, and Berck. Arguing that the material facts are undisputed, they contend that they are entitled to judgment as a matter of law declaring that Lobel's procurement of the Policy and subsequent sale of his beneficial interest in the Trust to LPC were legally valid and binding

transactions, and that LPC is entitled to enforce its beneficial interest in the Trust.

The Policy is an example of a recent development in the life insurance industry that has "bloomed into a new and very controversial cottage industry":  the acquisition of life insurance by an insured -- usually an elderly person -- for sale to a third party.  J. Alan Jensen & Stephan R. Leimberg, Stranger-Owned Life Insurance:  A Point/Counterpoint Discussion, 33 ACTEC J. 110, 110 (Fall 2007).  Often pejoratively termed "stranger-owned life insurance policies," these policies enable the insured to obtain ready cash by selling his policy to a stranger whose only interest in the insured is his early demise. These policies are lawful only if the insured purchases the policy with a good-faith intent to obtain insurance for the benefit of his family, loved one, or business; they are not lawful if the insured purchases the policy with the intent to resell it to a stranger at the earliest possible moment.

Because I conclude that Angel has alleged enough facts to state a claim that is plausible on its face -- that Lobel obtained the Policy with the prior intent to transfer it to a stranger with no "insurable interest" in his life -- the motion for judgment on the pleadings in LPC's favor is denied.

**BACKGROUND**

A.  **Facts**

For purposes of this motion, the facts as alleged in Angel's answer and counterclaims are assumed to be true.  Certain

additional facts are drawn from documents referred to in the pleadings and submitted with the motion papers.

## 1. **Lobel**

Lobel was the co-owner of Lobel's Butcher Shop in New York City. (CC ¶ 58).[1] He eventually retired to Florida, where he was a full-time resident in 2005. (Id. ¶ 59). He turned seventy-seven years old on August 11, 2005. (PX 8).[2]

## 2. **The Opportunity**

During 2005, Joel Miller, an insurance agent for Lincoln Life & Annuity Company of New York ("Lincoln Life"), made Lobel aware of a financial opportunity whereby he could receive an immediate, substantial cash payment by taking out a life insurance policy on himself for the benefit of an investor who was a stranger to him. Because the investor would pay all the premiums, there was virtually no cost to him. (CC ¶¶ 59, 61, 67).

Several steps were required. First, Lobel would apply for a large life insurance policy for the benefit of a trust in his name. (Id. ¶ 62). Simultaneously, he would establish an irrevocable trust to own the policy. (Id.). Lobel would pay only a $1,000 fee to establish the trust. (Id. ¶ 60). The trust would initially be for Lobel's benefit, but when the policy was issued to the trust, Lobel would immediately sell his beneficial

---

[1]  "CC" refers to Angel's answer and counterclaims.

[2]  "PX" refers to the exhibits attached to LPC's motion papers.

interest in the trust to the investor in exchange for an immediate cash payment. (Id. ¶¶ 60, 62). The investor would pay all the policy premiums and maintain the policy, and receive all the proceeds when Lobel died. (Id. ¶¶ 59, 62).

The proposal contemplated that neither Lobel nor his family would ever own the policy or have a beneficial interest in it, nor would Lobel have the realistic option to retain the policy for his own use. (Id. ¶¶ 60, 63). Lobel would never pay any premiums himself, nor would he receive financing from the investor to pay the premiums. (Id.).

Lobel had no personal desire to obtain a life insurance policy for the benefit of his family or as part of an estate planning decision, and he could not afford one even if he so desired. (See id. ¶¶ 39, 40, 52; see also Def. Mem. at 3 n.2).[3] He was attracted to the plan solely because of the promise of quick cash. (CC ¶ 52).

### 3. The Trust

On November 15, 2005, Lobel executed a Trust Agreement naming himself as "Depositor" and "Initial Beneficiary" and Hudson United Bank (the "Bank") as Trustee.[4] (Id. ¶ 66). The

---

[3]   References to "Def. Mem." are to Angel's memorandum of law in opposition to the motion. Although the counterclaims do not explicitly allege that Lobel could not afford a $10 million life insurance policy in 2005, they imply this. Moreover, in her motion papers, Angel indicates that she is prepared to amend her pleading to add these allegations. (See Def. Mem. at 3 n.2; Howe Aff. ¶ 3).

[4]   Angel's moving papers indicate that she is prepared to prove that Lobel never met the Trustee and signed all the papers in Florida, despite the fact that the Trust was established under

Trust Agreement mentioned LPC, the investor, by name and indicated a possible future transfer of the Policy to LPC. (PX 7, § 2.4(c)). Lobel had no input into the terms of the Trust. (CC ¶ 68). Rather, the Trust Agreement was prepared by counsel for LPC. (Id.). The signatures on the Trust Agreement were not executed in the presence of two witnesses who signed the Trust instrument. (Id. ¶ 69).

Prior to establishing the Trust, Lobel did not have a relationship with the Bank. (Id. ¶ 67). He was first introduced to the Bank by insurance agents Stephen Lockwood and/or Joel Miller, both of whom worked for Lincoln Life. (Id.). The Bank's office in New York is located in the same office building as Lockwood and LPC's offices. (PX 7, § 5.9(b); PX 9 (Lockwood); PX 11 (LPC)). The introduction was made for the a sole purpose of appointing an officer of the Bank as Trustee of the Trust. (CC ¶ 67).

### 4. **The Policy**

Also on November 15, 2005, Lobel signed an application for a $10 million life insurance policy with Lincoln Life. (Id. ¶¶ 65, 71). His signature was witnessed by Joel Miller. (PX 8, app. at 3). The final page of the application indicated that the insurance agents for the Policy were Joel Miller and Steven Lockwood and the page was signed only by them. (Id. app. at 5). A space was provided on the page for the agents to indicate the answer to the following question: "Does the client intend to use

New York law and the Policy delivery was deemed to have occurred in New York. (CC ¶ 64; see Def. Mem. at 4).

the policy for any type of viatical settlement, senior settlement, life settlement or for any other secondary market?" The question was left unanswered. (Id.).

The Policy's "Policy Specifications" page stated that the minimum initial premium due on or before the date of issue of December 14, 2005 to commence coverage under the Policy was $31,872.16. (Id. at 3). There is no indication that Lobel ever paid this or any other premium.

Lincoln Life issued the Policy on December 14, 2005 with the Trust as owner and beneficiary. (CC ¶ 72; PX 8). Lobel never received a copy of the Policy. (CC ¶ 73). On December 16, 2005, Lockwood notified Lobel by letter that Lincoln Life had agreed to issue the Policy. (Id. ¶ 74). Lockwood's letter noted that the first year's premium would be $572,000 and that subsequent premiums through the age of 88 would be $373,786 annually. (Id.).

Lockwood's letter also stated, "As discussed, if you do not wish to retain this policy for your estate planning needs, an investment group . . . has indicated to me that they [sic] would purchase your beneficial interest in the Trust for $300,000." (PX 9 at 1; CC ¶ 75). In reality, from the outset, Lobel did not intend to retain the Policy, but rather always intended to sell the Policy to the investor for a large cash payout. (CC ¶ 75). The identity of the investor -- LPC -- was known to all parties well in advance of the December 16, 2005 letter. (Id.).

The letter also enclosed two forms for Lobel to sign: one entitled "Beneficial Interest Transfer Agreement" and another

entitled "Acknowledgments and Consents Relating to Sale of Beneficial Interest." (Id. ¶ 74; PX 9). These forms provided for the immediate single payment of $300,000 by LPC to Lobel. (CC ¶ 77; PX 9). They also allowed for Lobel to transfer the beneficial interest in the Policy and the obligation to pay premiums from the Trust to LPC. (CC ¶ 74). The Transfer Agreement also provided that the beneficial interest in the Trust was "further assignable and saleable" by LPC. (Id. ¶ 78).

The "Acknowledgments and Consents Relating to Sale of Beneficial Interest" indicated that "[a]fter reviewing several alternatives for maintaining the Policy and paying the premium, Leon has determined that the sale of the Beneficial Interest to the Purchaser for the Cash Consideration is in his best interest and in the best interest of his family." (PX 9). It also stated that "Leon acknowledges that he has had sufficient time to thoroughly analyze and discuss the strategy of selling his Beneficial Interest in the Trust to the Purchaser." (Id.).

On December 20, 2005, Lobel signed both documents immediately upon receipt and returned them to Lockwood, resulting in the sale of his beneficial interest in the Trust to LPC. (CC ¶ 76). Therefore, there was at most a period of a few days when Lobel was the beneficiary of the Trust. (Id. ¶ 79). On January 4, 2006, Lockwood sent Robert Desch of the Bank Lobel's $1,000 check dated December 20, 2005 for deposit in the Trust to "be applied toward the next insurance premium that will be due." (PX 12). Lobel never actually paid any premiums on the Policy. (CC

¶ 79).  On January 5, 2006, Lobel received a $300,000 payment from LPC enclosed with a letter from Lockwood.  (Id. ¶ 81).

###     5.   Lobel's Death

Only five days later, on January 10, 2006, Lobel died. (Id. ¶ 82).  LPC filed a claim under the Policy.  (Id. ¶ 83). Lincoln Life refused to provide copy of the Policy to Lobel's family after his death.  (Id. ¶ 73).  In total, LPC paid only one quarter of the first year's Policy premiums (the sum of $149,000) which represented the minimum amount required by Lincoln Life to be paid for the Policy to go into effect.  (Id. ¶ 80).  After a year-long inquiry, Lincoln Life paid the death benefit to the Trust on January 17, 2007 -- $10,712,328.77, reflecting the face value of the Policy plus interest.  (Id. ¶ 84).

### B.   Procedural History

On January 22, 2007, LPC filed the instant action, seeking a declaration that it and not Lobel's estate is entitled to the corpus of the Trust.  Specifically, LPC seeks a declaration that the Beneficial Interest Transfer Agreement by which Lobel sold his ownership of the beneficial interest in the Trust to LPC is valid and binding, LPC acquired ownership of the beneficial interest in the Trust, and, consequently, Lobel's estate has no right, title, interest, or colorable recourse in the Trust.[5]

---

[5]     LPC amended its complaint on February 13, 2007 only to correct the name of the personal representative of Lobel's estate.  (PX 1 ¶ 1).

Angel filed her answer and counterclaims on March 12, 2007, and then filed a third-party complaint against the Trust and Trustee on March 13, 2007, seeking a declaration that the Trust is void and that Lobel's estate is entitled to recover the death benefits paid under the Policy. Angel does not seek to have the Policy voided -- rather, she asserts that the appropriate remedy is the disgorgement of the death benefits by the Trust to the Estate. On April 20, 2007, LPC answered the counterclaims and the Trust and Trustee answered the third-party complaint, asserting third-party counterclaims seeking the same relief as sought by LPC in its amended complaint. Angel filed her reply on May 14, 2007.

This motion followed.

## DISCUSSION

### A.  Standard of Review

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is analyzed under the same standard as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  See Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  On a motion for judgment on the pleadings, in determining whether the moving party is entitled to judgment as a matter of law, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in her favor.  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see Erickson v. Pardus, 127 S. Ct. 2197, 2199 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

In its recent decision in <u>Bell Atlantic Corp.</u>, the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from <u>Conley v. Gibson</u>, 355 U.S. 41, 45-47 (1957), adopting in its place a "plausibility" requirement. <u>Bell Atl. Corp.</u>, 127 S. Ct. at 1969. As interpreted by the Second Circuit, <u>Bell Atlantic Corp.</u> did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim <u>plausible</u>." <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007). The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'" <u>Patane v. Clark</u>, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting <u>Bell Atl. Corp.</u>, 127 S. Ct. at 1974).

In deciding a motion for judgment on the pleadings, a court may consider the pleadings and attached exhibits, statements, or documents incorporated by reference, and matters subject to judicial notice. <u>See</u> <u>Prentice v. Apfel</u>, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993)). "'[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations'" and will not defeat the motion. <u>Gavish v. Revlon, Inc.</u>, No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting <u>Citibank, N.A. v. Itochu Int'l, Inc.</u>, No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

Cases that hinge on an issue relating to state of mind should generally not be disposed of summarily. See Yiamouyiannis v. Consumers Union of U.S., Inc., 619 F.2d 932, 939 (2d Cir. 1980) (proof calling into question a party's state of mind "does not readily lend itself to summary disposition"); Niroomand v. Erie County Med. Ctr., No. 97 Civ. 0021E(H), 1996 WL 328183, at *4 (W.D.N.Y. June 04, 1996) ("Allegations of falsity, malice and intent have been properly pled and any determination of the existence vel non of such factors is not appropriate on a motion to dismiss."); Rockland County Sheriff's Deputies Ass'n v. Grant, 670 F. Supp. 566, 568 (S.D.N.Y. 1987) (claims that "typically turn on issues of fact concerning good faith or intent . . . [are] usually unsuited for summary judgment").

## B. **Was Lobel's Transfer of his Trust Interest to LPC Invalid Because LPC Lacked an Insurable Interest?**

### 1. Applicable Law

The law has long shown a disdain for "wager" insurance policies -- life insurance contracts that are "a mere wager, by which the party taking the policy is directly interested in the early death of the assured." Warnock v. Davis, 104 U.S. 775, 779 (1881). In Grigsby v. Russell, Justice Holmes explained the rationale for this concern:

> A contract of insurance upon a life in which
> the [policy owner] has no interest is a pure
> wager that gives the [policy owner] a
> sinister counter interest in having the life
> come to an end. And although that counter
> interest always exists, . . . the chance that
> in some cases it may prove a sufficient
> motive for crime is greatly enhanced if the

> whole world of the unscrupulous are free to
> bet on what life they choose.

222 U.S. 149, 154-55 (1911).

The "insurable interest rule" operates to prevent the issuance of "wager" life insurance policies. This principle is well-rooted in New York statutory law. New York Insurance Law § 3205(b)(2) provides:

> No person shall procure or <u>cause to be
> procured</u>, directly or <u>by assignment</u> or
> otherwise any contract of insurance upon the
> person of another unless the benefits under
> such contract are payable to the person
> insured or his personal representatives, or
> to a person having, at the time when such
> contract is made, an insurable interest in
> the person insured.

N.Y. Ins. Law § 3205(b)(2) (McKinney 2006) (emphasis added). New York Insurance Law § 3205(a)(1) defines the term "insurable interest" as:

> (A) in the case of persons closely related by
> blood or by law, a substantial interest
> engendered by love and affection; (B) in the
> case of other persons, a lawful and
> substantial economic interest in the
> continued life, health or bodily safety of
> the person insured, as distinguished from an
> interest which would arise only by, or would
> be enhanced in value by, the death,
> disablement or injury of the insured.

N.Y. Ins. Law § 3205(a)(1).

Federal and New York courts have continuously criticized attempts to evade the insurable interest rule. As early as 1881, in Warnock v. Davis, the Supreme Court addressed attempts to transfer policies to those without an insurable interest. In <u>Warnock</u>, the insured applied for a life insurance policy and simultaneously agreed to assign most of his interest

to an association that had no insurable interest in him; the day the policy was issued the insured assigned it to the association. The Court concluded, in dicta, that the insured's agreement to assign was invalid because the association lacked an insurable interest in his life.  Id. at 779-80.

In Grigsby v. Russell, the Supreme Court overruled the dicta in Warnock, concluding that an assignment is not automatically condemned when the assignee lacks an insurable interest, so long as there is no prior agreement to assign.  222 U.S. at 156-57.  The Grigsby Court drew the distinction that "cases in which a person having an interest lends himself to one without any, as a cloak to what is, in its inception, a wager, have no similarity to those where an honest contract is sold in good faith."  Id. at 156.  Hence, the Court held that while the lack of an insurable interest in the insured on the part of the assignee was not a bar to subsequent assignment, there must be an insurable interest in the first instance, as well as a good-faith intent to obtain insurance for the benefit of one's family or business.  Id. at 156-57.  The Court reiterated that "[t]he very meaning of an insurable interest is an interest in having the life continue."  Id. at 155.

The insurable interest rule, therefore, no longer uniformly prevents the transfer of a life insurance policy from the insured to a beneficiary who does not have an insurable interest.  New York Insurance Law § 3205(b)(1) reflects this change:

> Any person of lawful age may on his own
> initiative procure or effect a contract of
> insurance upon his own person for the benefit
> of any person, firm, association or
> corporation.  Nothing herein shall be deemed
> to prohibit the immediate transfer or
> assignment of a contract so procured or
> effectuated.

N.Y. Ins. Law § 3205(b)(1) (emphasis added).

Only one who obtains a life insurance policy on himself "on his own initiative" and in good faith -- that is, with a genuine intent to obtain insurance protection for a family member, loved one, or business partner, rather than an intent to disguise what would otherwise be a gambling transaction by a stranger on his life -- may freely assign the policy to one who does not have an insurable interest in him.  See Hota v. Camaj, 750 N.Y.S.2d 119 (2d Dep't 2002); Wells v. Squires, 102 N.Y.S. 597 (1st Dep't 1907).  In applying the Grigsby ruling, the court in Travelers Insurance Co. v. Reiziz, 13 F. Supp. 819, 820 (E.D.N.Y. 1935), concluded:

> [A]n assignment of a life insurance policy,
> when not made by the insured in bad faith and
> with the intention that the assignment is to
> be used as a mere cover for a wager policy,
> is not against public policy and is
> sanctioned. . . . It is undoubtedly true
> that, if the policy was taken out by the
> parties with a view to its immediate
> assignment, the transaction would be nothing
> more than a mere subterfuge to avoid the
> well-settled rule that a party cannot procure
> insurance upon the life of one in whom he has
> no insurable interest.  The authorities do
> not conflict upon this point.  But obviously
> the question whether the insured lent himself
> to one without an insurable interest in his
> life as a cloak to a gambling transaction
> (Grigsby v. Russell, supra) is not a question
> of law, but rather is a question of fact.

See also Steinback v. Diepenbrock, 158 N.Y. 24, 31 (N.Y. 1899)
("The insured, instead of taking out a policy payable to a person
having no insurable interest in his life, can take it out to
himself and at once assign it to such person.  But such an
attempt would not prove successful, for a policy issued and
assigned, under such circumstances, would be none the less a
wagering policy because of the form of it.").

        For a court to assess whether a policy was procured
"with a view to its immediate assignment," it considers the
intent of the insured who transfers the policy at the time the
policy is procured.  See Finnie v. Walker, 257 F. 698, 701 (2d
Cir. 1919) (non-contemporaneous assignment of policy held invalid
because "wagering intent" was established by fact assignee knew
that insured was ill and potential payout was large); Steinback,
158 N.Y. at 31 ("The intention of the parties procuring the
policy would determine its character, which the courts would
unhesitatingly declare in accordance with the facts, reading the
policy and the assignment together, as forming part of one
transaction.").  Courts consider factors such as whether the
insured paid premiums and the length of time the insured held the
policy before assigning it when deciding whether an arrangement
is simply a sham transaction designed to evade the insurable
interest rule or a genuine, good-faith assignment.  See id. at 24
(noting that insured waited five years to transfer policy, paid
premiums regularly for five years, and became pressed for money
and sold to assignee for little more than he would have received
to surrender policy).

The Office of General Counsel has issued opinions on behalf of the New York State Insurance Department applying these principles. Most recently, on December 19, 2005, the Office issued an opinion that clarified the statutory prohibition against wager policies. The opinion addressed one form of "free" insurance arrangement: a transaction where a third-party bank lends money to an older individual who uses the money to purchase a life insurance policy. The individual pays premiums under the agreement that gives the insured a put option to sell the policy to a third party on a pre-determined exercise date at least two years from the date of the loan. The opinion declared this arrangement impermissible because "it appears that the arrangement is intended to facilitate the procurement of policies solely for resale." The opinion also noted that the ability of the insured to immediately transfer a policy, "irrespective of the existence of an insurable interest in the assignee," does not permit procurement of a policy "solely as a speculative investment for the ultimate benefit of a disinterested third party. Such activity . . . is contrary to the long established public policy against 'gaming' through life insurance purchases."[6]

---

[6] While New York courts are not bound by these opinions, courts will uphold the interpretations of an agency charged with administration of a statute if the interpretations are not unreasonable or irrational. See, e.g., Kurcsics v. Merchants Mut. Ins. Co., 403 N.E.2d 159, 163 (N.Y. 1980).

## 2.  **Application**

LPC concedes that it never had an insurable interest in Lobel.  Accordingly, the motion must be denied if Angel sufficiently pleads that Lobel did not procure the Policy "on his own initiative" and that instead the transactions were designed "as a cloak to what [was], in its inception, a wager" by LPC on Lobel's life.  See N.Y. Ins. Law § 3205(b).  Angel pleads exactly this.

The counterclaims allege, explicitly or implicitly, the following facts, which must be assumed to be true at this stage of the litigation:

- Lobel had no prior interest in obtaining additional life insurance before he was approached by Miller with the plan to buy a policy for resale to an investor;

- the plan to resell the Policy to an investor existed before Lobel applied for the Policy;

- from the outset Lobel intended for the investor to pay all premiums, maintain the Policy, and receive any benefits under the Policy when he died;

- Lobel was ostensibly obtaining $10 million in life insurance, at age seventy-seven, for virtually no cost to him;

- Lobel could not afford to pay the extremely high premiums on the Policy and was attracted to the "quick cash" aspect of the plan;[7]

---

[7]  LPC's claim that Lobel's statement to the insurance company that he had a net worth of $8-10 million (PX 8) proves his ability to pay the Policy premiums would be unavailing upon a showing that Lobel did not in fact have such net worth and lied on his application.

- 18 -

- Lobel executed the Trust Agreement the same day he applied for the Policy;

- the Trust Agreement mentioned LPC by name as the possible future transferee;

- LPC was involved from the outset, as its counsel prepared the Trust Agreement;

- Lobel provided no input into the drafting of the documents;

- Lockwood's December 16, 2005 letter, dated just two days after the Policy was issued, noted Lobel's interest in assignment, and enclosed two forms that already named LPC as the transferee;

- Lobel signed the documents immediately upon receipt, and apparently did not take any time to consider other options or the details of LPC's offer;

- Lobel assigned his interest in the Trust just a few days after the Policy was issued; he was the beneficiary of the Policy for at most a few days; and he never paid any premiums on the Policy;

- Lobel was not even given a copy of the Policy; and

- when Lobel applied for the Policy, the agents did not answer the question in the application form asking whether the client was purchasing the insurance for "any type of viatical settlement, senior settlement, life settlement or for any other secondary market."

These factual allegations, taken together, surely make a plausible claim that Lobel intended to transfer the Policy to

LPC prior to procuring it.  Such a scheme surely could amount to an impermissible attempt to circumvent the prohibition on wager policies.

LPC argues that the following facts, taken together, support judgment on the pleadings in its favor:  Lobel signed the Policy application papers himself; he always had the ability to retain the Policy if he so chose; he alone established the Trust to hold the insurance; and he named himself as the sole beneficiary of the Trust at the outset and designated the Trust to be the sole beneficiary of the Policy.  These facts, even if true, do not require a different result at this juncture, as they do not contradict Lobel's alleged intent to sell the Policy to LPC before the Policy was procured.[8]  Moreover, these facts are contradicted by Angel's allegation that her father could not afford the premiums:  $572,000 the first year alone and $373,786 annually thereafter until he turned eighty-eight years old.  If this allegation is true, Lobel did not have the ability to keep the Policy for himself.

LPC further argues that Lobel had an absolute right to transfer the Policy to LPC because he assigned it after the Policy was issued naming the Trust as the initial beneficiary (with Lobel himself as the Trust's beneficiary).  Angel, however, does not dispute that, as a general matter, a policy may benefit a trust and that the beneficial interest in that trust may be transferred to a third party with no insurable interest.  LPC

_____

[8]     The fact that Lincoln Life paid the proceeds to the Trust after a lengthy investigation is not controlling.

cannot overcome the fact, however, that only interests in valid policies may be transferred, and if there was a pre-assignment agreement to transfer to LPC the Policy is an invalid wager policy. The disparate sections of New York Insurance Law must work in tandem and not in opposition: immediate surrender of a policy is permissible, but only if the initial acquisition of the policy was in good faith and there was no prior intent or agreement to transfer it to an otherwise disinterested investor.

Similarly, LPC's argument that single contractual steps in a sequence must be considered as separate legal transactions and not as a single, sham transaction cannot prevail. The law prohibits gaming the system to procure wager policies, regardless of the creativity of form. See Steinback 158 N.Y. 24.

Finally, as previously noted, cases that turn on the issue of intent are generally not appropriate for summary disposition. Because Lobel's pre-assignment intent is central to LPC's claim, and Angel's claim -- that Lobel never intended to obtain life insurance but always intended, for a $300,000 fee, to transfer his beneficial interest in the Policy to an investor -- is more than plausible, LPC cannot prevail as a matter of law at this stage in the litigation.

## CONCLUSION

For the reasons set forth above, plaintiff and third-party defendants' motion for judgment on the pleadings is denied.

SO ORDERED.

Dated:     New York, New York
           January 22, 2008

DENNY CHIN
United States District Judge

**APPEARANCES:**

For Plaintiff:

        THACHER PROFITT AND WOOD LLP
            By:  Oliver J. Armas, Esq.
                Richard Francis Hans, Jr., Esq.
        Two World Financial Center
        New York, New York  10281


For Defendant:

        HOLLAND & KNIGHT LLP
            By:  David D. Howe, Esq.
                Marc L. Antonecchia, Esq.
        50 North Laura Street, Suite 3900
        Jacksonville, Florida  32202


For Third-Party Defendants:

        FEIN & JAKAB
            By:  Peter Jakab, Esq.
        233 Broadway
        New York, New York  10279